**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 1:23-CR-448 (JEB)** |
| **COLBY PURKEL,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Colby Purkel to 6 months' incarceration, 36 months' supervised release, $2,000 in restitution, and the mandatory $100 special assessment. The guidelines range for Purkel's conduct is zero to six months of incarceration; the government's recommendation is at the top of this range.

### I.      INTRODUCTION

The defendant, Colby Purkel, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

1

Purkel entered the Capitol grounds' restricted perimeter and made his way to the east side of the building. There, he was involved in a protracted fight to enter the Capitol building that involved two major pushes against police. At approximately 3:07 p.m., with alarms blaring, police officers tried to push rioters out of the Capitol building while keeping other rioters on the outside from getting in. Purkel joined in a push to try to get into the Capitol building before being repelled by police. Later, around 3:21 p.m., police once again tried to evacuate rioters. This time, those on the outside—including Purkel—were more successful, and shoved their way inside. Once there, Purkel and dozens of others rushed to the doors of the Capitol Rotunda, where another line of officers was trying to block the mob from advancing. Purkel joined this third scrum, and after several minutes of pushing, the group successfully shoved the police to one side and entered. There, Purkel and others were quickly surrounded by police reinforcements. Purkel was escorted out with his arms raised, though once out of the immediate eye of the police, he managed to triumphantly record his exit from the Capitol building. He then traveled to the West Front of the Capitol where he remained on restricted Capitol grounds until twilight.

The government recommends that the Court sentence Purkel to six months' incarceration, 36 months' supervised release, $2,000 in restitution, and the mandatory $100 special assessment. This sentence reflects the gravity of Purkel's conduct, but also acknowledges his admission of guilt.

---

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

The government refers the Court to the stipulated Statement of Offense filed in this case, ECF No. 38, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.     Purkel's Role in the January 6, 2021 Attack on the Capitol

On January 6, 2021, Colby Purkel traveled with his father and others to enter the restricted Capitol grounds, which he made his way through, including by walking from the Capitol's north side to the building's east side and up the steps to the Capitol building. There, he was part of the crowd that tried to force entry into the Capitol building through the East Rotunda Doors. Purkel raised his phone up in the air to videotape the scene. A glass window in the door was partly smashed, and a loud siren could be heard, indicating that the door had been breached.



*Image 1: Purkel (indicated in green) walking around the Capitol's north side*



*Image 2: Purkel photographing or filming the chaos at the East Rotunda Doors (the doors leading from outside the Capitol building on the east side into the lobby immediately outside the Rotunda)*



*Image 3: Smashed glass in the East Rotunda Door near where Purkel stood*

At approximately 3:07 p.m., as one group of rioters tried to leave the Capitol building and another tried to enter it, police attempted to shut the East Rotunda doors to stop the latter group from getting inside. From the outside, Purkel and others pushed against the officers, temporarily blocking the police from closing the doors before, ultimately, officers managed to repel the rioters and shut the entrance. Purkel was near the front of the line, just feet away from officers trying to push the rioters back. Though the officers' goal was obvious, Purkel didn't retreat—rather, he appeared to lean his weight towards them. And when the police finally managed to close the doors, Purkel remained at or near the front of the crowd.



*Image 4: Purkel joins crowd trying to enter through East Rotunda Doors*



*Image 5: Purkel struggles with police around 3:07 p.m.*

Around 3:21 p.m., with the doors opened again to get rioters out of the Capitol building, Purkel and other rioters managed to push their way in, streaming into the lobby directly outside the Rotunda.



*Image 6: Purkel entering the Capitol building (the lobby outside the Rotunda) around 3:21 p.m.*

Purkel and others rushed through the lobby to the doors of the Rotunda, where a line of police officers was trying to stop rioters from advancing. Purkel joined in a push against the officers who, for several minutes, managed to hold the line until they were shoved as a group to the side and the rioters, including Purkel, managed to rush into the Rotunda.



*Image 7: Purkel near the inner Rotunda doors*

Once inside the Rotunda, the rioters were quickly surrounded by a group of officers, who were able to control the situation.



*Image 8: Purkel inside the Rotunda*

After a few minutes, police escorted Purkel, along with other protesters, out of the Rotunda. Purkel initially left with his hands raised, though later appeared to photograph or video record his

exit.



*Image 9: Purkel is escorted out of the Rotunda*



*Image 10: Purkel leaves the Capitol building while seemingly recording his exit on his phone*

Though Purkel left the Capitol building, he did not immediately leave the Capitol grounds. Rather, he walked from the east to the west side of the restricted Capitol grounds, where rioters remained.



*Image 11: Purkel on the east side of the Capitol*



*Image 12: Purkel on the west side of the Capitol*

## III.    THE CHARGES AND PLEA AGREEMENT

On December 20, 2023, a federal grand jury returned an indictment charging Purkel with

five counts, including Civil Disorder in violation of 18 U.S.C. § 231(a)(3). On, April 22, 2024, Purkel was convicted of that offense based on a guilty plea entered pursuant to a plea agreement.

## IV.     STATUTORY PENALTIES

Purkel now faces sentencing on Count One of the Indictment, Civil Disorder in violation of 18 U.S.C. § 231(a)(3). As noted in the Presentence Report issued by the U.S. Probation Office, ECF No. 39 ("PSR"), Purkel faces up to five years of imprisonment, a fine of $250,000, and a supervised release term of up to three years. PSR at ¶ 5. Purkel also agreed to pay a special assessment of $100 and $2,000 in restitution. *Id.* at ¶¶ 5, 13.

## V.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The parties and Probation Office agree on the Chapter Two and Three Guidelines calculations in this case:

Count One: 18 U.S.C. § 231(a)(3)

| U.S.S.G. § 2A2.4(a) | Base Offense Level | 10 |
| U.S.S.G. § 3E1.1(a) | Acceptance of Responsibility | -2 |
| **Total Adjusted Offense Level:** | | **8** |

*See* ECF No. 33 ("Plea Agreement") at ¶¶ 5(A) and (B); PSR ¶¶ 8, 40-41, 85. The Probation Office also applied a two-point adjustment for a "Zero-Point Offender," pursuant to Section 4C1.1 of the Sentencing Guidelines. PSR ¶ 42.

*Inapplicability Of U.S.S.G. § 4C1.1*

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline,

U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. As noted in the Plea Agreement, it is the defendant's (Purkel's) burden to show that the adjustment applies. Plea Agreement at ¶ 5D; *see also United States v. Yang*, No. CR 23-100 (JDB), 2024 WL 519962, at *2 (D.D.C. Feb. 9, 2024) ("[T]he government bears the burden of proof in seeking sentencing enhancements under the Guidelines, but *the defendant bears the burden in seeking sentencing reductions*.") (quoting *United States v. Keleta*, 552 F.3d 861, 866 (D.C. Cir. 2009)) (emphasis added).

Section 4C1.1 does not apply in this case, based on Purkel's use of violence and credible threats of violence against people and property under a totality of the circumstances. As discussed above, Purkel was involved in three separate pushes against police – two at the East Rotunda Doors leading into the Capitol Building (one at 3:07 p.m. and one at 3:21 p.m.) and one at the inner Rotunda door leading from the east lobby into the Rotunda. During the first push, Purkel was close to the front of the mob, just feet away from the police who desperately tried to close the doors. During the third push, he made his way nearly to the front of the line of rioters, once again just feet away from the police who were trying to stop the rioters' advances. In both moments, Purkel was able to see rioters shove police. Yet he continued to advance, and to contribute to the mob that eventually broke the line of officers and forced its way into the Capitol Rotunda.

Due to the unique nature of the January 6 mob, the harms caused by the January 6 riot, and the significant need to deter future mob violence, the government submits that even if the Court were to find that § 4C1.1 applies, the Court should nevertheless vary upwards by two levels to counter any reduction in offense level. Such treatment would recognize the unique nature of the

criminal events of January 6, 2021, coupled with the overwhelming need to ensure future deterrence, despite a person's limited criminal history.[2]

Finally, to avoid unnecessary litigation, if the court declines to apply § 4C1.1, the government requests that the Court make clear at sentencing that it would have imposed the same sentence regardless of whether § 4C1.1 applies.[3]

---

[2] If the Court believes that Section 4C1.1 applies to Purkel, the Court should vary upward by two levels to account for the reduction under 4C1.1. An upward variance is necessary because the January 6 riot was a violent attack that threatened the lives of legislators and their staff, interrupted of the certification of the 2020 Electoral College vote count, did irrevocable harm to our nation's tradition of the peaceful transfer of power, caused more than $2.9 million in losses, and injured more than one hundred police officers. Every rioter, whether or not they personally engaged in violence or personally threatened violence, contributed to this harm. *See, e.g., United States v. Rivera*, 21-cr-60 (CKK), ECF No. 62 at 13 ("Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood. Only when all of the floodwaters subside is order restored to the field. The same idea applies in these circumstances. Many rioters collectively disrupted congressional proceedings and each individual rioters contributed to that disruption. Because [the defendant's] presence and conduct in part caused the continued interruption to Congressional proceedings, the court concludes that [the defendant] in fact impeded or disrupted the orderly conduct of Government business or official functions"). Thus the defendant's conduct caused a significant disruption to a vital governmental function, warranting an upward variance. *See United States v. Eicher*, No. 22-cr-038 (BAH), Sentc'g Hrg. Tr. at 48 (varying upward by two levels to offset the Section 4C1.1 reduction).

Although the provision took effect after January 6, 2021, the Sentencing Commission enacted § 4C1.1 based on recidivism data for offenders released in 2010. *See* U.S. SENT'G COMM'N, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 (2021), available at https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010. Given the unprecedented nature of the Capitol attack, there is no reason to believe this historical data is predictive of recidivism for defendants who engaged in acts of political extremism on January 6. This is particularly so given the degree to which individuals, including defendants who have been sentenced, continue to propagate the same visceral sentiments which motivated the attack. *See, e.g., United States v. Little*, No. 21-cr-315 (RCL), ECF No. 73 at 4 ("The Court is accustomed to defendants who refuse to accept that they did anything wrong. But in my thirty-seven years on the bench, I cannot recall a time when such meritless justifications criminal activity have gone mainstream.").

[3] U.S.S.G. § 5C1.1 has also been amended with a new application note providing that if a defendant receives an offense level reduction under §4C1.1 and either their applicable guideline range is in Zone A or B of the Sentencing Table, or the guideline range overstates the seriousness of the offense, imprisonment may not be appropriate. *See* U.S.S.G. § 5C1.1, comment. n. 10. The

*Guidelines Range*

Finally, the U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 46; Plea Agreement at ¶ 5C. Accordingly, based on the government's calculation of the defendant's total adjusted offense level, after acceptance of responsibility, at 8, Purkel's Guidelines imprisonment range is 0 to 6 months' imprisonment.[4] The PSR and the defendant's plea agreement contains the same estimated Guidelines range. PSR ¶ 82; Plea Agreement at ¶ 5E.

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of the recommended term of incarceration.

### A.   Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Purkel's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Purkel repeatedly tried to break into the Capitol building, once at 3:07 p.m. and again at 3:21 p.m. Both moments threatened officers' safety. Purkel again threatened officers' safety when he joined a crowd that violently forced itself against a line of officers desperately trying to block rioters from entering the Rotunda. Finally, Purkel showed

---

government submits that for the same reasons that § 4C1.1 should not be applied in this case, a sentence of imprisonment is appropriate notwithstanding Application Note 10 to § 5C1.1.

[4] If the Court both (1) chooses to apply a two-level reduction pursuant to U.S.S.G. § 4C1.1 and (2) does not apply a two-level upward variance, the Total Offense Level would be 6 instead of 8. However, this would not change the Guidelines imprisonment range, which would remain 0 to 6 months' imprisonment.

14

disregard for the gravity of his offense when he chose to commemorate his time in the Capitol building by recording his exit from it. The nature and circumstances of Purkel's offense were of the utmost seriousness, and fully support the government's recommended sentence of six months' incarceration, 36 months' supervised release, $2,000 in restitution, and a $100 special assessment.

### B.   The History and Characteristics of the Defendant

Purkel has no criminal history (PSR ¶¶ 44-46) and is currently employed (PSR ¶68). He has no reported history of mental health or substance abuse issues (*Id.* at ¶¶ 61-63) that would have affected him on January 6. Accordingly, there is nothing in Purkel's background, history, or characteristics which would serve to mitigate or aggravate his conduct on January 6.

### C.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Purkel's criminal conduct on January 6 was the epitome of disrespect for the law. As Judge Jackson observed, "We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power." *United States v. Cronin*, 22-CR-233 (ABJ), Tr. 06/09/23 at 20.

### D.   The Need for the Sentence to Afford Adequate Deterrence

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving

domestic terrorism, which the breach of the Capitol certainly was.[5] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a term of incarceration. Purkel showed a concerning disregard for the law by joining in several scrums that endangered police officers, and by casually recording his criminal conduct.   By repeatedly endangering officers and by actually filming or photographing his crimes, Purkel showed that he believed he was above or beyond the reach of the law. A meaningful sentence is necessary to show otherwise.

Furthermore, Purkel's conduct involved a *series* of violent confrontations and poor decisions. Purkel joined pushes against officers three times in two different locations, and only left the Capitol building after police reinforcements escorted him, along with other protesters, out of the Rotunda. Even then, not only did Purkel decide to take a moment to commemorate his crime by recording his exit from the Capitol building, but he bafflingly decided to remain on restricted Capitol grounds after that, traveling to the West Front of Capitol grounds (where some of the most violent attacks against police officers took place that day), as police tried to clear the area. There were several moments at which Purkel could and should have stopped, turned around, or left, but he failed to do so. Accordingly, a sentence of incarceration appears necessary to deter Purkel from future violence and induce compliance with the law going forward.

---

[5] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

### E.     The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.     Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18

U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[6] "When an offense is uniquely serious, courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[7]

---

[6] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[7] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Hess*, 23-CR-86 (RCL), the defendant entered the Capitol building through the East Rotunda Doors, near where Purkel pushed against the police. As police officers fired pepper balls and attempted to physically remove the rioters, Hess held his ground. Government Sentencing Memorandum at 3-6, *United States v. Hess*, 23-CR-86 (D.D.C. Feb. 12, 2024), ECF No. 37. The officers eventually removed Hess and the other rioters by pushing them back out the East Rotunda Doors. *Id.* But as an officer tried to close the doors, Hess moved to stop him. *Id.* The officer told Hess to "stop" multiple times, but Hess pushed the officer with his right arm while holding the door open with his left arm. *Id.* Eventually forced out of the building, Hess bragged about what happened on social media. *Id.* at 7. Hess's and Purkel's confrontations with police were just feet and minutes from each other, and both men pushed to help their fellow rioters in. Both did so despite obvious evidence that they were not supposed to be in the Capitol building, and not supposed to fight the police. Hess was sentenced to nine months' incarceration, 36 months' supervised release, and $2,000 in restitution. Because Purkel did not appear to make direct physical contact with any officers in the video footage available, he deserves a somewhat lower sentence than Hess's. But Purkel's conduct was still substantial. Hess's violence near the East Rotunda Doors occurred over six minutes; essentially it was a continuous effort to get into, and remain in, the building. Purkel, by contrast, engaged in a sustained effort to advance, first trying to enter

BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

around 3:07 PM, then again around 3:21 PM. Purkel's actions showed a patience—and strategy—that Hess seemingly lacked.

In *United States v. Johnson*, 21-CR-407 (DLF), Daniel Johnson, along with his father Daryl, entered the Capitol building through a window near the Senate Wing Door and remained in the building for about 26 minutes. Government Sentencing Memorandum at 6, *United States v. Johnson*, 21-CR-407 (D.D.C. May 25, 2022), ECF No. 58. At the East Rotunda Doors—again, near to where Purkel confronted police, although a few minutes earlier—Johnson encountered a line of police officers trying to stop rioters from entering the building through the East Front. *Id.* at 8-19. Johnson and a group of rioters rushed to push past the officers, open the doors, and let other rioters in. *Id.* After leaving the Capitol grounds, Daniel Johnson bragged about his actions on social media. *Id.* at 20-21. Both Purkel and Johnson decided to help their fellow rioters advance into the Capitol building. And while Johnson was in the Capitol building longer than Purkel (Johnson spent a little less than 30 minutes in the building, while Purkel—having entered the Capitol around 3:21 PM and left the Rotunda around 3:26 PM—spent about five), Purkel was involved in multiple pushes ever-further into the building. Daniel Johnson was sentenced to four months' incarceration, 12 months' supervised release, and $2,000 in restitution. Purkel deserves a somewhat higher sentence in light of his multiple pushes and his traveling further into the Capitol building than Johnson.

In *United States v. Yates*, 23-CR-372 (TNM), the defendant entered the Capitol building through the Senate Wing Door and eventually made his way to the area outside the Rotunda Doors. Government Sentencing Memorandum at 3-8, *United States v. Yates*, 23-CR-372 (D.D.C. June 5, 2024), ECF No. 29. There, he joined the stream of rioters (that Purkel was a part of) rushing from

the outside to the Rotunda. With Purkel and others, Yates pushed against the line of officers to enter the Rotunda itself. Yates was sentenced to six months' incarceration, 24 months' supervised release (including three months' home detention), $2,000 in restitution and a special assessment of $100. Yates spent more time in the Capitol (over an hour), but Purkel was involved in multiple pushes against officers. Accordingly, Purkel deserves a similar sentence.

## VII. RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[8] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Purkel must pay $2,000 in restitution, which reflects in part the

---

[8] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

role Purkel played in the riot on January 6.[9] Plea Agreement at 8. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.* Purkel's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol. *See id.* at ¶ 12; *see also* PSR at ¶ 104.

## VIII.   FINE

The defendant's conviction for violating 18 U.S.C. § 231(a)(3) subject him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b)(3). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines require a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a) (2023). Purkel makes between $3,800 and $4,700 a month. PSR ¶ 73. He has no assets, liens, or judgments against him, though according to the Presentence Report his credit card and other debts suggest that he "does not appear that he would have resources to pay a fine." PSR ¶ 76, 80.

## IX.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of six months' incarceration, 36 months' supervised release, $2,000 in restitution, and

---

[9] Unlike under the Sentencing Guidelines for which the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

$100 in special assessments.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:   /s/ Brendan Ballou
       Brendan Ballou
       Special Counsel
       DC Bar No. 241592
       United States Attorney's Office
       601 D Street NW
       Washington, DC 20001
       (202) 431-8493
       brendan.ballou-kelley@usdoj.gov