**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 1:23-CR-448 (JEB)** |
| **WILLARD PURKEL,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Willard Purkel to eight months' incarceration, 36 months' supervised release, 100 hours' community service, $2,000 in restitution, the mandatory $100 special assessment, and a fine.

### I.   INTRODUCTION

The defendant, Willard Purkel, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

1

On January 6, 2021, Purkel trespassed over the Capitol grounds' restricted perimeter and made his way to the east side of the building. There, he was involved in a protracted fight to enter the Capitol. At approximately 3:07 p.m., with alarms blaring, police officers tried to push rioters out of the building while keeping rioters on the outside from getting in. Purkel joined in a push to try to get into the Capitol before being repelled by police, touching against one officer, and then another, as he did so. Later, around 3:21 p.m., police once again tried to evacuate rioters. This time, those on the outside—including Purkel—were more successful, and shoved their way inside. Once there, Purkel and dozens of others rushed to the doors of the Capitol Rotunda, where a line of officers were trying to block them from advancing. Purkel joined the scrum, and after several minutes of pushing, the group successfully shoved the police to one side and entered. There, Purkel and others were quickly surrounded by police. While surrounded by police, Purkel took a defiant selfie photograph in the Rotunda before being escorted out. After being expelled from the building, Purkel nevertheless climbed on top of an armored government vehicle, and stayed on the grounds as afternoon turned to evening.

The government recommends that the Court sentence Purkel to eight months' incarceration, 36 months' supervised release, 100 hours' community service, $2,000 in restitution, the mandatory $100 special assessment, and a fine. This sentence reflects the gravity of Purkel's conduct, but also acknowledges his admission of guilt.

---

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

## II.      FACTUAL BACKGROUND

### A.      The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF No. 38, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.      Purkel's Role in the January 6, 2021 Attack on the Capitol

On January 6, 2021, Willard Purkel attended the "Stop the Steal" rally near the Washington Monument. He wore a tan jacket, tan pants, black tactical vest with an American flag on it, and navy-blue cap. He also carried a tan backpack. Purkel photographed or filmed moments from the rally on his phone.

  

*Image 1: Willard Purkel (circled in red) at the Stop the Steal rally*          *Image 2: Purkel at the Stop the Steal rally*

Sometime after the rally, Purkel made his way to the Capitol, where he walked north to get to the building's east side. On the east side of the Capitol building, Purkel was part of the crowd that tried to force its entry through the East Rotunda Doors into the Capitol. A glass window in the door was partly smashed, and a loud siren could be heard, indicating that the door had been

breached.



*Image 3: Purkel outside the East Rotunda Doors*



*Image 4: Smashed glass in the East Rotunda Door*



*Image 5: Purkel visible in the same video moments earlier*

At approximately 3:07 p.m., one group of rioters tried to enter through the East Rotunda

Door, while another group of rioters tried to exit. Police, meanwhile, tried to shut the doors to stop

an influx of rioters. Purkel, attempting to get in, pushed against the officers, blocking them from

closing the doors before the police managed to do so. Purkel touched one officer, and then another,

as he tried to push his way in, before finally being repelled back.



*Image 6: Purkel joins crowd trying to enter through East Rotunda Doors*



*Image 7: Purkel struggling with police (circled in green) around 3:07 p.m.*

Around 3:21 p.m., with the doors opened again to get rioters out of the building, Purkel

managed to push his way in, streaming into the lobby outside the Rotunda.



*Image 8: Purkel around 3:21 p.m.*

Purkel then joined in group of rioters that pushed against police who were trying to prevent the protesters from entering the Rotunda itself. Shortly before the police could close the door around 3:25 p.m., Purkel forced himself into the Rotunda.



*Image 9: Purkel near inner Rotunda doors*

Once inside, the rioters were surrounded by a group of officers, who were able to control

the situation. As the police worked to get control of the area, Purkel took a selfie.



*Image 10: Purkel takes selfie in the Capitol Rotunda*

After a few minutes, Purkel, along with other protesters, was escorted out of the Rotunda

and taken out of the building. Purkel appeared to photograph or video his exit.



*Image 11: Purkel escorted out of the Rotunda*



*Image 12: Willard Purkel leaving the Capitol building*

Though Purkel left the Capitol building, he did not immediately leave the Capitol grounds. On the east side of the Capitol, for instance, Purkel climbed atop an armored truck. Eventually, he walked to the west side of the Capitol, and remained until the afternoon began to turn to evening.



*Image 13: Purkel on the east side of the Capitol*



*Image 14: Purkel atop an armored truck*



*Image 15: Purkel on the west side of the Capitol*

### III.    THE CHARGES AND PLEA

On December 20, 2023, a federal grand jury returned an indictment charging Purkel with violations of 18 U.S.C. § 231(a)(3) (Civil Disorder), 18 U.S.C. § 1752(a)(1) (Entering or Remaining in any Restricted Building or Grounds Without Lawful Authority); 18 U.S.C. § 1752(a)(2) (Disorderly and Disruptive Conduct in a Restricted Building or Grounds); 40 U.S.C. § 5104(e)(2)(D) (Disorderly Conduct in a Capitol Building); and 40 U.S.C. § 5104(e)(2)(G)

(Parading, Demonstrating, or Picketing in a Capitol Building). On June 3, 2024, Purkel was convicted of that offense based on a guilty plea to all counts in the indictment.

## IV.    STATUTORY PENALTIES

Purkel now faces sentencing on all counts of the Indictment. As noted in the Presentence Report issued by the U.S. Probation Office, ECF No. 39 ("PSR"), Purkel faces the following statutory penalties:

- Count 1: A maximum term of imprisonment of five years for this Class D Felony. 18 U.S.C. § 231(a)(3).

- Counts 2-3: A maximum term of imprisonment of one year for these Class A Misdemeanors. 18 U.S.C. §§ 1752(a)(1) and 1752(a)(2).

- Counts 4-5: A maximum term of imprisonment of six months for these Class B Misdemeanors. 40 U.S.C. §§ 5104(e)(2)(D) and (e)(2)(G).

PSR ¶¶ 97-99.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The government agrees with the Probation Office that the adjusted offense level in this case is 13, though it disagrees that a two-point reduction for "zero-point offenders" applies under U.S.S.G. § 4C1.1. While Purkel has no reported criminal history, his actions on January 6 did involve physical contact with two police officers as he tried to force his way into the Capitol. In particular, when Purkel first tried to force his way into the Capitol at approximately 3:07 PM, he

touched against one officer, and then another, before being pushed back as the police managed to close the doors. These officers were surrounded by rioters, and through his contact, Purkel both threatened their safety and slowed their closing of the doors. Because the defendant used violence or credible threats of violence in connection with the offense, he is ineligible to receive the adjustment pursuant to U.S.S.G. § 4C1.1(a)(3). The government is aware of multiple cases in which courts have rejected the application of § 4C1.1 to January 6 defendants on similar grounds. *See, e.g.*, Sentencing Tr., *United States v. Hess*, 23-CR-86 (RCL) (D.D.C. Feb. 26, 2024) (declining to apply the 4C1.1 adjustment when the defendant pushed an officer who was attempting to close the East Rotunda Door); Sentencing Tr., *United States v. Reyher et al.*, 23-CR-138 (RBW) (D.D.C. Feb. 27, 2024) (declining to apply the 4C1.1 adjustment when defendant pushed into police officers).

Due to the unique nature of the January 6 mob, the harms caused by the January 6 riot, and the significant need to deter future mob violence, the government submits that even if the Court were to find that § 4C1.1 applies, the Court should nevertheless vary upwards by two levels to counter any reduction in offense level. Such treatment would recognize the unique nature of the criminal events of January 6, 2021, coupled with the overwhelming need to ensure future deterrence, despite a person's limited criminal history.

Finally, to avoid unnecessary litigation, if the court declines to apply § 4C1.1, the government requests that the Court make clear at sentencing that it would have imposed the same sentence regardless of whether § 4C1.1 applies.[2]

---

[2] U.S.S.G. § 5C1.1 has also been amended with a new application note providing that if a defendant receives an offense level reduction under § 4C1.1 and either their applicable guideline range is in Zone A or B of the Sentencing Table, or the guideline range overstates the seriousness

With Purkel's adjusted offense level at 13 and a two-point reduction for acceptance of responsibility (but no reduction under U.S.S.G. § 4C1.1) Purkel's total offense level is 11.   With a criminal history category of I, his Guidelines sentencing range is 8-14 months.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of the recommended term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Purkel's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Purkel repeatedly tried to break into the Capitol, once at 3:07 p.m. and again at 3:21 p.m. At the 3:07 p.m. incident in particular, Purkel's push resulted in him touching two officers in sequence before he was ultimately repelled. Purkel again threatened officers' safety when he joined a mob of rioters that violently forced itself against a line of officers desperately trying to block rioters from entering the Rotunda. Finally, Purkel showed disregard for the law when he took a selfie in the Capitol Rotunda while surrounded by officers, and later climbed on top of an armored vehicle. The nature and circumstances of Purkel's offense were of the utmost seriousness, and fully support the government's recommended sentence of eight months' incarceration, 36 months' supervised release, 100 hours' community service, $2,000 in restitution, and a $100 special assessment.

---

of the offense, imprisonment may not be appropriate. *See* U.S.S.G. § 5C1.1, comment. n. 10. The government submits that for the same reasons that § 4C1.1 should not be applied in this case, a sentence of imprisonment is appropriate notwithstanding Application Note 10 to § 5C1.1.

### B.  The History and Characteristics of the Defendant

Until January 6, 2021, Purkel led a normal life. He has no criminal history, PSR ¶¶ 51-53, and primarily raised his son by himself. *Id.* ¶ 64. He has worked consistently as a mechanic since at least 2012. *Id.* ¶ 85.

While Purkel's military service is laudable, it renders his conduct on January 6, 2021, all the more troubling. As a former military member, Purkel was well aware that violent takeover of U.S. government buildings by a mob was not an acceptable way to protest the result of an election. His voluntary decision to storm a guarded government building with his son by his side is nothing short of shocking in light of his former military service and training.

### C.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Purkel's criminal conduct on January 6 was the epitome of disrespect for the law. As Judge Jackson observed, "We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power." Hearing Tr. At 20, *United States v. Cronin*, 22-CR-233 (ABJ) (D.D.C. June 9, 2023).

### D.   The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving

domestic terrorism, which the breach of the Capitol certainly was.[3] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a term of incarceration. Purkel showed a concerning disregard for the law by joining in several scrums that endangered police officers, by casually photographing or filming his criminal conduct, and by climbing on an armored vehicle. His actions show that Purkel quite simply did not believe or did not care that his behavior was dangerous or illegal. With another looming election, a meaningful sentence is necessary to deter Purkel from future violence and encourage compliance with the law going forward.

### E.        The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national

---

[3]  *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.   Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have

sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[4]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[5] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

Most relevantly, in *United States v. Purkel et al.*, 23-CR-448 (JEB), the defendant's son, Colby Purkel, was sentenced to 21 days' imprisonment for similar—though less serious—conduct. Like Willard Purkel, Colby Purkel, attempted to push into the Capitol around 3:07 p.m., and again around 3:21 p.m., ultimately forcing his way into the Capitol Rotunda. As noted above, however, Willard Purkel's conduct was more serious than his son's. Most importantly, unlike Colby Purkel, Willard Purkel made physical contact with two officers as he attempted to push his way into the Capitol. This posed an obvious and serious threat to the police, and Willard Purkel deserves a more serious sentence for that reason alone. Additionally, however, Willard Purkel showed obvious

---

[4] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[5] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

disrespect while celebrating his actions in the Capitol Rotunda, while surrounded by law enforcement officers attempted to remove rioters. And even after being expelled from the Capitol, Willard Purkel climbed on top of a police vehicle outside the building, serving as an additional reminder of law enforcement's difficulties in corralling a dangerous crowd. Coupled with the fact that Willard Purkel was Colby's father, and thus an authority figure who should have known better, Willard Purkel deserves a significantly longer sentence than his son's.

In *United States v. Hess*, 23-CR-86 (RCL), the defendant entered the Capitol through the East Rotunda Doors, near where Purkel pushed against the police. As police officers fired pepper balls and attempted to physically remove the rioters, Hess held his ground. Government Sentencing Memorandum at 3-6, *United States v. Hess*, 23-CR-86 (D.D.C. Feb. 12, 2024), ECF No. 37. The officers eventually removed Hess and the other rioters by pushing them back out the East Rotunda Doors. *Id.* But as an officer tried to close the doors, Hess moved to stop him. *Id.* The officer told Hess to "stop" multiple times, but Hess pushed the officer with his right arm while holding the door open with his left arm. *Id.* Eventually forced out of the building, Hess bragged about what happened on social media. *Id.* at 7. Hess's and Purkel's confrontations with police were just feet and minutes from each other, and both men pushed to help their fellow rioters in. Both did so despite obvious evidence that they were not supposed to be in the Capitol, and not supposed to fight the police. Hess was sentenced to nine months' incarceration, 36 months' supervised release, and $2,000 in restitution. Given the similarity of their conduct, Purkel deserves a sentence similar to Hess's.

In *United States v. Yates*, 23-CR-372 (TNM), the defendant entered the Capitol through the Senate Wing Door and eventually made his way to the area outside the Rotunda Doors.

Government Sentencing Memorandum at 3-8, *United States v. Yates*, 23-CR-372 (D.D.C. June 5, 2024), ECF No. 29. There, he joined stream of rioters from the outside rushing to the Rotunda that Purkel was a part of. With Purkel and others, Yates pushed against the line of officers to enter the Rotunda itself. Yates was sentenced to six months' incarceration, 24 months' supervised release (including three months' home detention), $2,000 in restitution and a special assessment of $100. Yates spent more time in the Capitol (over an hour), but Purkel was involved in multiple pushes against officers, and later took a selfie and climbed on a police car. Purkel deserves a more substantial sentence.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C.  § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence,"

§ 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). But because Purkel was convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[6]

Because the defendant in this case engaged in criminal conduct in tandem with hundreds

---

[6] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

of other defendants charged in other January 6 cases, and [his or her] criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment."); *cf.* 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court … may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.").

More specifically, the Court should require Purkel to pay $2,000 in restitution for his convictions on Counts Purkel. This amount fairly reflects Purkel's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids

sentencing disparity.

## VIII.   FINE

The defendant's conviction for violating 18 U.S.C. § 231(a)(3) subject him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b)(3). The defendant's conviction for violating 18 U.S.C. §§ 1752(a)(1) and (2) subject him to a statutory maximum fine of $100,000 for each offense. 18 U.S.C. § 3571(b)(5). Finally, the defendant's conviction for violating 40 U.S.C. §§ 5104(e)(2)(D) and (G) subject him to a statutory maximum fine of $5,000 for each offense. 18 U.S.C. § 3571(b)(6).

In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines require a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a) (2023). Purkel makes around $8,000 a month. PSR ¶ 85. He is thus capable of paying a fine.

## IX.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of eight months' incarceration, 36 months' supervised release, 100 hours' community service, $2,000 in restitution, a $100 in special assessments, and a fine.


Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:    /s/ Brendan Ballou
       Brendan Ballou
       Special Counsel
       DC Bar No. 241592
       United States Attorney's Office
       601 D Street NW
       Washington, DC 20001
       (202) 431-8493
       brendan.ballou-kelley@usdoj.gov

23